1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

Intel Corp.,

                   Plaintiff,

    v.

Wi-LAN, Inc., et al.,

                 Defendants.

_____/

NO. C 08-04555 JW

**FIRST CLAIM CONSTRUCTION ORDER**

## I.  INTRODUCTION

Plaintiff Intel Corp. ("Intel") is a provider of semiconductors and microprocessors, including products which incorporate WiMAX[1] technology.  Plaintiff alleges that various Wi-LAN affiliates[2] purport to be owners of U.S. Patent No. 6,459,687 ("'687 Patent") and U.S. Patent No. 6,683,866 ("'866 Patent") (collectively, "Patents-in-Suit").  The Patents-in-Suit pertain generally to the wireless communications industry, and more specifically to methods and apparatuses for efficiently allocating data between a management system and wireless end users.  Defendant Wi-LAN has publicly asserted that the Patents-in-Suit relate to products with WiMAX functionality and confirmed its ability and willingness to file a patent infringement lawsuit against Intel for its products that incorporate WiMAX technology.  In response, Intel commenced this declaratory action

---

[1]  WiMAX (Worldwide Interoperability for Microwave Access) is a wireless broadband communications standard promulgated by the Institute of Electrical and Electronics Engineers (IEEE).

[2]  Wi-LAN, Inc., Wi-LAN Technologies Corp., Wi-LAN Technologies, Inc. and Wi-LAN V-Chip Corp. (collectively, "Wi-LAN").

1 seeking, *inter alia*, a declaration that the Patents-in-Suit are invalid, unenforceable and are not being

2 infringed.

3       On November 19, 2010, the Court conducted a hearing in accordance with <u>Markman v.</u>

4 <u>Westview Instruments, Inc.</u>,[3] to construe language of the asserted claims over which there is a

5 dispute.  This First Claim Construction Order sets forth the Court's construction of the disputed

6 words and phrases.

## II.  BACKGROUND

**A.**    **The '687 Patent**

9       The '687 Patent is entitled "Method and Apparatus for Implementing a MAC Coprocessor in

10 a Communication System."

11       The Abstract of the '687 Patent describes the invention as follows:

> Disclosed is a novel method and system for efficiently synchronizing, transmitting, and receiving data between a base station and a plurality of customer premises.  A MAC coprocessor (MCP) is implemented, which works in conjunction with the MAC in order to produce a robust, high throughput communication system.  The MAC coprocessor performs many of the tasks typically performed by prior art MAC's, including: during a downlink, storing a data frame, sorting the data frame according to modulation type or other criteria, determining when the data frame is full, and appending a set of CPE settings to the data frame.  During an uplink, the MAC coprocessor receives all data and routes the data either to the MAC or a network backhaul.  A MAC coprocessor may be used in both the base station and Customer Premises.  In both the downlink and uplink processes, having a MAC coprocessor working in conjunction with the MAC may significantly increase the communication system's throughput.

**B.**    **The '866 Patent**

19       The '866 Patent is entitled "Method and Apparatus for Data Transportation and

20 Synchronization Between MAC and Physical Layers in a Wireless Communication System."

21       The Abstract of the '866 Patent describes the invention as follows:

> The present invention is a novel method and apparatus for efficiently transporting and synchronizing data between the Media Access Control (MAC) and physical communication protocol layers in a wireless communication system.  Depending on the length of the MAC packet to be transported, the present invention either fragments or concatenates the MAC packet when mapping to the physical layer.  When a MAC packet is too long to fit in one TC/PHY packet, the MAC packet is fragmented and the resultant multiple TC/PHY packets are preferably transmitted back-to-back within the same TDD frame.  When a MAC packet is

27     [3]  517 U.S. 370 (1996).

2

United States District Court

For the Northern District of California

shorter than a TC/PHY packet, the next MAC packet is concatenated with the current MAC packet into a single TC/PHY packet unless an exception applies (e.g., a change in CPE on the uplink or a change in modulation on the downlink).  When an exception applies, the next MAC packet is started on a new TC/PHY packet following either a CTG or MTG.

**C.**   **Procedural History**

On September 30, 2008, Intel filed its Complaint for Declaratory Judgment[4] and its Amended Complaint for Declaratory Judgment.[5]  On June 18, 2009, Wi-LAN filed its Answer.  (See Docket Item No. 197.)  On October 15, 2009, the Court granted Wi-LAN's Motion to Transfer to the Eastern District of Texas a number of related declaratory judgment actions involving other patents owned by Wi-LAN.[6]  On October 21, 2010, the Court granted Plaintiff's Motion for Summary Judgment on the issue of non-infringement against nine patents[7] and denied Wi-LAN's Motion to Dismiss.  (Docket Item No. 303.)

### III.  STANDARDS AND PROCEDURES FOR CLAIM CONSTRUCTION

**A.**   **General Principles of Claim Construction**

Claim construction is a matter of law, to be decided exclusively by the Court.  Markman, 517 U.S. at 387.  When the meaning of a term used in a claim is in dispute, the Court invites the parties to submit their respective proposed definitions and a brief, outlining the basis for their proposals.  In addition, the Court conducts a hearing to allow oral argument of the respective proposed definitions. After the hearing, the Court takes the matter under submission, and issues an Order construing the meaning of the term.  The Court's construction becomes the legally operative meaning of the term that governs further proceedings in the case.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The Court recognizes that claim construction is a fluid process, wherein the Court may consider a number of extrinsic sources of evidence so long as they do not contradict the

---

[4]  (See Docket Item No. 1.)

[5]  (See Docket Item No. 6.)

[6]  (See CV-08-5544-JW, Docket Item No. 40; CV-08-5543-JW, Docket Item No. 82; and CV-08-5624-JW, Docket Item No. 55.)

[7]  U.S. Patent Nos. 6,693,887; 6,925,068; 6,956,834; 7,006,530; 7,023,798; 7,289,467; and 7,317,704 ("Adaptive Allocation Patents") and U.S. Patent Nos. 7,197,022 and 7,379,411.

United States District Court
For the Northern District of California

1   intrinsic evidence.  However, the Court acknowledges that greater weight should always be given to

2   the intrinsic evidence.  Phillips v. AWH Corp., 415 F.3d 1303, 1324 (Fed. Cir. 2005).

3   **B.      Construction from the Viewpoint of an Ordinarily Skilled Artisan**

4           A patent's claims define the scope of the patent: the invention that the patentee may exclude

5   others from practicing.  Phillips, 415 F.3d at 1312.  The Court generally gives the patent's claims

6   their ordinary and customary meaning.  In construing the ordinary and customary meaning of a

7   patent claim, the Court does so from the viewpoint of a person of ordinary skill in the art at the time

8   of the invention, which is considered to be the effective filing date of the patent application.  Thus,

9   the Court seeks to construe the patent claim in accordance with what a person of ordinary skill in the

10  art would have understood the claim to have meant at the time the patent application was filed.  This

11  inquiry forms an objective baseline from which the Court begins its claim construction.  Id.

12          The Court proceeds from that baseline under the premise that a person of ordinary skill in the

13  art would interpret claim language not only in the context of the particular claim in which the

14  language appears, but also in the context of the entire patent specification, of which it is a part.

15  Phillips, 415 F.3d at 1313.  Additionally, the Court considers that a person of ordinary skill in the art

16  would consult the rest of the intrinsic record, including any surrounding claims, the drawings and the

17  prosecution history—if it is in evidence.  Id.;  Teleflex, Inc. v. Fisosa N. Am. Corp., 299 F.3d 1313,

18  1324 (Fed. Cir. 2002).  In reading the intrinsic evidence, a person of ordinary skill in the art would

19  give consideration to whether the disputed term is a term commonly used in lay language, a

20  technical term, or a term defined by the patentee.

21  **C.      Commonly Used Terms**

22          In some cases, disputed claim language involves a commonly understood term that is readily

23  apparent to the Court.  In such a case, the Court considers that a person of ordinary skill in the art

24  would give to it its widely accepted meaning, unless a specialized definition is stated in the patent

25  specification or was stated by the patentee during prosecution of the patent.  In articulating the

26  widely accepted meaning of such a term, the Court may consult a general purpose dictionary.

27  Phillips, 415 F.3d at 1314.

28                                                      4

**United States District Court**
For the Northern District of California

**United States District Court**

For the Northern District of California

**D.** **Technical Terms**

If a disputed term is a technical term in the field of the invention, the Court considers that one of skill in the art would give the term its ordinary and customary meaning in that technical field, unless a specialized definition is stated in the specification or during prosecution of the patent. Phillips, 415 F.3d at 1314. In arriving at this definition, the Court may consult a technical art-specific dictionary or invite the parties to present testimony from experts in the field on the ordinary and customary definition of the technical term at the time of the invention. Id.

**E.** **Defined Terms**

The Court acknowledges that a patentee is free to act as his or her own lexicographer. See, e.g., Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1357 (Fed. Cir. 1999). Acting as such, the patentee may use a term differently than a person of ordinary skill in the art would understand it, without the benefit of the patentee's definition. Vitronics Corp., 90 F.3d at 1582. Thus, the Court examines the claims and the intrinsic evidence to determine if the patentee used a term with a specialized meaning.

The Court regards a specialized definition of a term stated in the specification as highly persuasive of the meaning of the term as it is used in a claim. Phillips, 415 F.3d at 1316-17. However, the definition must be stated in clear words, which make it apparent to the Court that the term has been defined. See id.; Vitronics Corp., 90 F.3d at 1582. If the definition is not clearly stated or cannot be reasonably inferred, the Court may decline to construe the term pending further proceedings. Statements made by the patentee in the prosecution of the patent application as to the scope of the invention may be considered when deciding the meaning of the claims. Microsoft Corp. v. Multi-Tech Systems, Inc., 357 F.3d 1340, 1349 (Fed. Cir. 2004). Accordingly, the Court may also examine the prosecution history of the patent when considering whether to construe the claim term as having a specialized definition.

In construing claims, it is for the Court to determine the terms that require construction and those that do not. See U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997). Moreover, the Court is not required to adopt a construction of a term, even if the parties have

5

United States District Court

For the Northern District of California

1    stipulated to it. <u>Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.</u>, 429 F.3d 1364, 1376 (Fed. Cir.

2    2005). Instead, the Court may arrive at its own constructions of claim terms, which may differ from

3    the constructions proposed by the parties.

## IV.  DISCUSSION

**A.     The '687 Patent**

Claim 56 of the '687 Patent provides:[8]

> A system for transmitting at least a portion of **an uplink data frame in a wireless communication system, said data frame having a plurality of data packets and having a predetermined period**, said communication system having a **base station** and a plurality of **Customer Premises Equipment's ("CPE")**, each of said plurality of CPE's being coupled to a plurality of end user connections, the system comprising:
>
>> a processor disposed in said **base station** including a Media Access Controller ("MAC") configured to allot a specific portion of an uplink portion of said data frame to a specific **CPE** and to transmit an uplink map indicating said allotment to said specific **CPE**;
>>
>> an uplink data buffer configured to store uplink data received from said plurality of end user connections coupled to said specific **CPE**,
>>
>> **a coprocessor disposed in said specific CPE configured to allocate said allotted portion of said data frame amongst a plurality of end user connections coupled to said specific CPE**, said coprocessor comprising
>>
>>> a look-up table configured to store priority parameters corresponding to each of said plurality of end user connections coupled to said specific **CPE**,
>>>
>>> a prioritizing module configured to prioritize said uplink data in said uplink data buffer according to said priority parameters corresponding to each of said plurality of end user connections connected to said specific **CPE**,
>>>
>>> a decision module configured to receive said uplink map from said processor and determine, according to said received uplink map, when a data burst should be sent to said **base station**, wherein said data burst contains data pulled from said uplink data buffer in an order determined by said prioritizing module.

Claim 64 of the '687 Patent provides:

> A method of transmitting at least a portion of **an uplink data frame in a wireless communication system, said data frame having a plurality of data packets and having a predetermined period**, said communication system having a **base station** and a plurality of

---

27    [8] Unless otherwise indicated, all bold typeface is added by the Court for emphasis.

28                                                     6

**Customer Premises Equipment's ("CPE")**, each of said plurality of **CPE's** being coupled to a plurality of end user connections, the method comprising:

transmitting from said **base station** to a specific **CPE** an uplink map indicating an allotted portion of said **uplink data frame** allotted to said specific **CPE**;

said **CPE** performing the steps of

storing a plurality of uplink data received from said plurality of end user connections coupled to said specific **CPE** in an uplink data buffer,

receiving said uplink map from said **base station**,

prioritizing said uplink data in said uplink data buffer according to a priority parameter corresponding to each of said plurality of end user connections,

allocating said allotted portion of said data frame amongst a plurality of end user connections coupled to said specific **CPE**,

determining a transmit time, according to said received uplink map, when a data burst should be sent to said base station, wherein said data burst contains data pulled from said uplink data buffer in an order determined by said prioritizing,

transmitting said data burst at said transmit time.

### 1.   The Preamble's Limitation on Claim Scope

Of the four disputed terms in the '687 Patent, three are introduced in the Preambles to Claims 56 and 64 (hereafter, "Disputed Claims"). The Court considers whether the Preambles are limiting.

Aside from introducing a system claim in Claim 56 and a method claim in Claim 64, the Preambles to Claims 56 and 64 are identical and provide:

A [system for/method of] transmitting at least a portion of an uplink data frame in a wireless communication system, said data frame having a plurality of data packets and having a predetermined period, said communication system having a base station and a plurality of Customer Premises Equipment's ("CPE"), each of said plurality of CPE's being coupled to a plurality of end user connections, the [system/method] comprising:

('687 Patent, Col. 30:17-24, 31:10-17.)

"A preamble to a claim has the import that the claim as a whole suggests for it." Griffin v. Bertina, 285 F.3d 1029, 1033 (Fed. Cir. 2002) (internal citations omitted). "[T]here is no 'litmus test' for determining whether preamble language is limiting." Bicon, Inc. v. Straumann Co., 441 F.3d 945, 952 (Fed. Cir. 2006). A preamble simply stating "the intended use or purpose of the

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

invention will usually not limit the scope of the claim, unless the preamble provides antecedents for ensuing claim terms and limits the claim accordingly." Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1345 (Fed. Cir. 2003). "An intended use or purpose [appearing in the preamble to a claim] usually will not limit the scope of the claim because such statements usually do no more than define a context in which the invention operates." Id. "[P]reamble language will limit the claim if it recites not merely a context in which the invention may be used, but the essence of the invention without which performance of the recited steps is nothing but an academic exercise." Id. This principle, which is to be analyzed based on the claim as a whole, frequently holds true for method claims. Id. Further, the preamble may operate as a claim limitation when the inventor uses it to recite structure that defines the invention and adopts that structure in the body of the claim. Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp., 55 F.3d 615, 620 (Fed. Cir. 1995).

Here, the Preambles describe that the invention exists in a "wireless communication system" that contains a "base station" and "a plurality of Customer Premises Equipment's ("CPE")." The term "base station" recited in the Preambles are antecedent to "said base station" recited in the Disputed Claims. The Preambles state that a "plurality of said CPE's" are "coupled to a plurality of end user connections." However, the language in the body of the Disputed Claims contains only references to "a *specific* CPE" (emphasis added). Further, the Preambles recite a structure for "an uplink data frame." The language that indicates the "uplink data frame" contains "a plurality of data packets" and has "a predetermined period" is only recited in the Preambles.

Thus, with respect to the "Customer Premises Equipment's" and "uplink data frame" phrases, the Court finds that the inventors used "both the [P]reamble[s] and the body of the claim[s] to define the subject matter of the claimed invention." Bicon, 441 F.3d at 953 (internal citations and quotations omitted). Accordingly, the Court construes the Preambles as limitations on the scope of the Disputed Claims and proceeds to construe the meaning of the following phrases used in the Preambles: "Customer Premises Equipment's ("CPE")," "uplink data frame," and "base station."

United States District Court

For the Northern District of California

### a.      "Customer Premises Equipment's ("CPE")"

The parties dispute the meaning of the phrase "Customer Premises Equipment's ("CPE")." This phrase is not defined in the Preambles nor is it defined in the body of the Disputed Claims. However, in the Background section of the specification, the phrase is first used to describe the existing state of the art:

> Recently, wideband or "broadband" wireless communications networks have been proposed for delivery of enhanced broadband services such as voice, data and video.  The broadband wireless communication system facilitates two-way communication between a plurality of base stations and a plurality of **fixed subscriber stations or Customer Premises Equipment ("CPE")**.

('687 Patent, Col. 1:53-59.)

First, as a preliminary matter, the Court finds that a person of ordinary skill in the art reading the Background section would understand that the inventors used "fixed subscriber stations" synonymously with "Customer Premises Equipment ("CPE")."

Second, a person of skill in the wireless communications system art would understand that subscriber stations can be fixed or mobile.[9]  The definition of "CPE" as "fixed" equipment is further discussed in the Detailed Description of the Preferred Embodiment section of the specification. There, the inventors describe that a "cell" contains, "a plurality of customer premises equipment ("CPE's") located at fixed customer sites . . . ."  ('687 Patent, Col. 4:62-65.)  A person of ordinary skill in the art would understand this to describe equipment that was physically located at fixed premises.

Third, the use of the modifier "fixed" in "fixed subscriber stations" narrows the definition of "subscriber stations" not of the equipment at the subscriber stations.  Correspondingly, "Customer Premises Equipment" narrows the definition of "Equipment."

---

[9]  See NEWTON'S TELECOM DICTIONARY 192 (14th ed. 1998) ("CPE Terminal equipment - telephones, key systems, PBXs, modems, video conferencing devices, etc. - connected to the telephone network and residing on the customer's premises."); HARGRAVE'S COMMUNICATIONS DICTIONARY 132 (2001) ("A term that refers to both owned and leased terminal equipment, including phones, PABXs, modems, and associated equipment at a subscriber's premises as well as the wiring connecting to a carrier's communication channel(s) at the demarcation point.").

United States District Court

For the Northern District of California

Accordingly, as used in the Preambles to Claims 56 and 64 of the '687 Patent, the Court construes the phrase "Customer Premises Equipment's ("CPE")" to mean:

**That part of the wireless communication system equipment that is located at the fixed premises of customers.**

In addition, because the phrase "Customer Premises Equipment's ("CPE")" is recited in every independent Claim of the '687 Patent[10] without further definition, the Court finds that it carries to same meaning in each Claim as in the Preambles. Moreover, the body of Claim 64 recites the functions of the "CPE." ('687 Patent, Col. 31:21-34, 32:1-4.) While recognizing that CPE's have enumerated functions, the Court declines to include their enumerated functions in its definition of the subject phrase.

### b.     "an uplink data frame"

The parties dispute the meaning of the term "uplink data frame." Before construing the phrase "uplink data frame," the Court will discuss three related concepts that are described by the inventors: uplink transmission, data frames and duplexing.

The phrase "uplink transmission" refers to data transmissions from the subscriber unit to the base station. ('687 Patent, Col. 1:37-38.) Correspondingly, "downlink transmission" refers to data transmissions in the reverse direction. ('687 Patent, Col. 1:35-36.)

The word "frame" and the phrase "data frame" are discussed throughout the specification to mean a unit for the transmission of data.

> [A] time **"frame"** is used as the basic information transmission unit. **Each frame is sub-divided into a plurality of time slots.** ('687 Patent, 1:27-29.)

> [A] frame is defined as **comprising N consecutive time periods** or time slots (where N remains constant). ('687 Patent, 5:39-41.)

> In the present disclosure, **a predetermined period** of one millisecond will be used in many examples. . . [I]t is contemplated that any other time period, smaller or greater, than one millisecond may be substituted for the predetermined period. ('687 Patent, 3:50-55.)

> FIG. 2 shows a TDD frame and multi-frame structure that can be used by a communication system (such as that shown in FIG. 1). As shown in FIG. 2, the TDD **frame is subdivided into a plurality of physical slots ("PS").** In the embodiment of FIG. 2, the

---

[10]  (See '687 Patent, Claims 1, 24, 38, 49, 56 and 64.)

10

United States District Court

For the Northern District of California

1
2

**TDD frame is one millisecond in duration and includes physical slots**. Alternatively, the present invention can be used with frames having longer or shorter duration and with more or less PS's. ('687 Patent, 6:7-14.)

3

The word "duplexing" is described in the Background section of the specification as follows:

4
5

Subscriber units typically communicate with a selected base station using a **"duplexing" scheme thus allowing for the exchange of information in both directions of connection**. . . .

6
7
8
9
10

Depending upon the design criteria of a given system, the prior art wireless communication systems have typically used either time division duplexing ("TDD") or frequency division duplexing ("FDD") methods to facilitate the exchange of information between the base station and the subscriber units. **In a TDD system, data is transmitted and received on a single channel**. A typical TDD system will allocate a portion of each data frame to transmitting data and a remaining portion to receiving data. Alternatively, a FDD system transmits and receives data simultaneously. More specifically, **a typical FDD system may transmit an entire data frame on a first channel, while simultaneously receiving an entire data frame on a second channel**. Both TDD and FDD systems of duplexing are well known in the art.

11

('687 Patent, Col. 1:31-34, 39-52.)

12

A person of ordinary skill would understand that a "data frame" is an information

13

transmission unit with a predetermined period (i.e., one millisecond) that is subdivided into a

14

constant number (N) of individual physical time slots. The duplexing scheme selected for data

15

transmission determines how and for what purpose the individual physical time slots within a data

16

frame will be used. In a TDD system, a single channel is used for uplink and downlink

17

transmission. In an FDD system, separate channels are used. As a result, a full data frame

18

containing N physical time slots may be split between uplink and downlink transmission or used

19

solely for one or the other.

20

In the Detailed Description of the Preferred Embodiment section of the specification, the

21

inventors discuss the transmission process for a TDD system and an FDD system:

22
23
24

In one embodiment adapted for use in **a TDD system**, a frame is defined as comprising N consecutive time periods or time slots (where N remains constant). In accordance with this "frame-based" approach, the first N1 time slots are dynamically configured (where N is greater than or equal to N1) for downlink transmissions only. **The remaining N2 time slots are dynamically configured for uplink transmissions only (where N2 equals N-N1)**. . . .

25
26
27

For example, in one embodiment each data frame has a time frame of one millisecond. Depending on several factors, discussed below, **the up/down split Module may allot 500 microseconds to downlink and 500 microseconds to uplink**, i.e., an even split between downlink and uplink. **In a subsequent time frame, the up/down split**

28

11

1   **module may need to allot 700 microseconds to downlink and only 300 microseconds to uplink**.

2   ('687 Patent, Col. 5:39-46, 10:53-60.)

3

4   In yet another embodiment, **a FDD system** may be implemented by **sending N time slots of data and receiving N time slots of data simultaneously on different channels**.

5   In a FDD system, the time frame is not divided between uplink and downlink data. Instead, **a FDD downlink subframe is an entire frame of downlink data (e.g. one millisecond) on a first channel, and an uplink subframe is an entire frame of uplink data on a second channel**.   In a typical FDD system the downlink subframe and uplink subframe **may be transmitted simultaneously during the same predetermined period**. Thus, in a FDD system both the BS and the CPE's may receive and transmit at the same time, using different channels.   In another embodiment, the downlink subframe and uplink subframe may not be transmitted at the same time, but still use different channels.

6

7

8

9   ('687 Patent, Col. 5:66-67, 6:1, 6:54-65.)  Thus, the inventors envisioned that the invention could be

10   practiced in both a TDD and an FDD system.[11]

11   According to the specification, the amount of physical time slots dedicated to uplink

12   transmission is a value that is less than or equal to the total amount of physical time slots within the

13   predetermined period of a data frame.  In an FDD system, the amount of physical time slots for

14   uplink transmission is equal to the total amount of physical time slots in a frame.  A TDD system

15   dynamically configures the portion of physical time slots available for uplink transmission in

16   sequential time frames.  With this background, the Court considers the meaning of the disputed

17   phrase, "uplink data frame."

18   The Preambles impose a limitation on the meaning of "uplink data frame" as follows:

19   ". . . said data frame having a plurality of data packets and having a predetermined period, . . ."

20   ('687 Patent, Col. 30:18-20, 31:11-13.)  According to the specification, the meaning of "a

21   predetermined period" differs depending on whether a TDD system or an FDD system is used.  In an

22   FDD system, the predetermined period is the full length of the data frame.  In a TDD system, the

23   predetermined period is dynamic and thus can change in subsequent data frames.  However, the

24   specification states that the TDD system determines the downlink/uplink split prior to transmission.

25

26   [11]  "Although the present invention is described with reference to its application in a TDD system, the invention is not so limited.  Those skilled in the communications art shall recognize that

27   the present inventive method and apparatus can readily be adapted for use in a FDD system."  ('687 Patent, Col. 5:34-38.)

28   12

United States District Court

For the Northern District of California

1    Thus, while the split between uplink and downlink is dynamic in a TDD system, the portion of the

2    frame dedicated to uplink or downlink transmission in any given frame remains predetermined.

3          Accordingly, as used in the Preambles of Claims 56 and 64 of the '687 Patent, the Court

4    construes the phrase "an uplink data frame" to mean:

5          **A data frame with a predetermined period of time containing N slots, where the**
     **number of slots dedicated to uplink transmission is less than or equal to N and is**
6    **determined prior to transmission of the data frame.**

7    This construction applies to the phrases "said uplink data frame"[12] and "uplink portions of

8    said data frame"[13] as used in the body of the Claims of the '687.

9                        **c.    "base station"**

10         The last of the phrases in the Preambles the definitions of which are disputed by the parties is

11   the phrase "base station." This phrase is not defined either in the Preamble or the body of the

12   Disputed Claims. However, it is recited in every independent Claim of the '687 Patent[14] and is used

13   throughout the specification:

14         The key objective of these wireless communication systems is to provide
     communication channels on demand between the plurality of subscriber units and their
15   respective **base stations** in order to connect a subscriber unit user with the fixed network
     infrastructure (usually a wire-line system). . . . Subscriber units typically communicate with
16   a selected **base station** using a "duplexing" scheme thus allowing for the exchange of
     information in both directions of connection.
17         Transmissions from the **base station** to the subscriber unit are commonly
     referred to as "downlink" transmissions. Transmissions from the subscriber unit to the **base**
18   **station** are commonly referred to as "uplink" transmissions. . . . The broadband wireless
     communication system facilitates two-way communication between a plurality of **base**
19   **stations** and a plurality of fixed subscriber stations or Customer Premises Equipment
     ("CPE"). One exemplary broadband wireless communication system is described in the
20   incorporated U.S. Pat. No.: 6,016,311, and is shown in the block diagram of FIG. 1. As
     shown in FIG. 1, the exemplary broadband wireless communication system includes a
21   plurality of cells. . . . Each cell provides a wireless connectivity between the cell's **base**
     **station** and a plurality of CPE's positioned at fixed customer sites throughout the coverage
22   area of [the] cell.

23   (Patent '687, Col. 1:22-26, 31-38, 56-67, 2:1.)

24   _____

25         [12] (See e.g., Patent '687, Claim 64, Col. 31:19-20.)

26         [13] (See e.g., Patent '687, Claim 56, Col. 30:27-28.)

27         [14] (See '687 Patent, Claims 1, 24, 38, 49, 56 and 64.)

28                                        13

United States District Court

For the Northern District of California

In the wireless communication equipment industry, the ordinary and customary meaning of "base station" is a device that connects a mobile communications device to a landline telecommunications network.[15]  A person of ordinary skill in the art reading the specification, including the Disputed Claims, would understand that the inventors used the term "base station" with its ordinary and customary meaning.

Further, while some dictionaries define a base station as fixed, the written description discusses an embodiment of the invention where the base station need not be wired.  The embodiment describes a communication system in which the base station both transmits and receives wirelessly by communicating with the CPE over a wireless link and where the "backhaul" is comprised of wireless microwave links technology:

> The wireless communication system comprises a plurality of cells.  Each cell contains a **base station ("BS")** and a plurality of customer premises equipment ("CPE's") located at fixed customer sites throughout the coverage area of the cell.  **Each CPE communicates with the BS over a wireless link.  The BS, in turn, communicates with the network using a communication link or "backhaul."  The backhaul may comprise,** for example, coaxial cable, fiberoptic cable, **microwave links,** or other high throughput connections.

(Patent '687, Col. 4:61-67, 5:1-4.)

Accordingly, as used in every independent Claim of the '687 Patent, the Court construes the phrase "base station" to mean:

> **A component of a wireless communication system that transmits and receives data between a fixed telecommunications infrastructure and at least one Customer Premises Equipment.**

> **2.    "a coprocessor disposed in said specific CPE configured to allocate said allotted portion of said data frame amongst a plurality of end user connections coupled to said specific CPE"**

The Court proceeds to construe the last disputed term in Claim 56 of the '687 Patent which is not referenced in the Preamble.  For convenience of construction, the components described by Claim 56 may be summarized as: (1) processor phrase; (2) uplink data frame phrase; and (3)

---

[15]  <u>See</u> NEWTON'S TELECOM DICTIONARY 88 (14th ed. 1998) ("A base station is the final device a mobile radio transceiver (transmitter/receiver) talks to, to talk to a person or to get to the landline phone network public or private."); MCGRAW-HILL ILLUSTRATED TELECOM DICTIONARY 66 (4th ed. 2001) ("A device that connects wireless communications to the land-line phone network.").

United States District Court

For the Northern District of California

1   coprocessor phrase.  In the "coprocessor" phrase, the parties dispute the meaning of the term

2   "coprocessor."

3        The term "coprocessor" is not explicitly defined in Claim 56.  Although not defined, Claim

4   56 recites the following use of the coprocessor, as coupled to a CPE: to allocate an allotted portion

5   of data frames to end user connections coupled to the CPE.  Further, Claim 56 recites the following

6   components of a coprocessor: (1) a look-up table; (2) a prioritizing module; and (3) a decision

7   module.

8        The invention described in the '687 Patent relates to the transport of data between a base

9   station and a plurality of CPE's.  The problems with prior art transportation are detailed in the

10  Background section of the specification as follows:

11       Prior art communication systems typically include a media access control ("MAC")
    which allocates available bandwidth on one or more physical channels on the uplink and the

12  downlink.  Within the uplink and downlink subframes, the base station MAC allocates the
    available bandwidth between the various services depending upon the priorities and rules

13  imposed by their quality of service ("QoS").  The MAC transports data between higher
    layers such as TCP/IP, and a physical layer, such as physical channel.  According to the prior

14  art, the MAC is software that executes on a processor in the base station.  When requests for
    bandwidth arrive from CPE's, the MAC software must allocate the frame bandwidth among

15  all received requests.  If an unexpected high volume of data (bandwidth requests, for
    example) is received by the MAC, there is a possibility that the software might not be able to

16  respond in real time.  If the MAC software cannot respond in real time, data will be lost.  For
    example, MAC software may not be able to process all the incoming data in time to transmit

17  it in the current time frame.  This may result in data transfer being delayed, and possibly
    missed by the receiving CPE.  Alternatively, the data may be discarded by the MAC,

18  possibly corrupting large quantities of data.  A MAC that can respond in real-time to a high
    data volume is therefore desirable.  In addition, a system that allows a higher data throughput

19  than MAC software is desired.

20  ('687 Patent, Col. 2:32-57.)

21       The '687 Patent teaches a novel method for efficiently synchronizing, transmitting and

22  receiving data between a base station and a plurality of CPE's.

23       The present invention is a novel method and apparatus for efficiently synchronizing,
    transmitting, and receiving data between a base station and a plurality of CPE's.  The method

24  and apparatus achieve these objectives by implementing a **MAC coprocessor**, which works
    in conjunction with the MAC, in order to produce a robust, high throughput communication

25  system.
         In one embodiment of the present invention, a **MAC coprocessor is coupled to the**

26  **base station MAC**.  **The MAC coprocessor may take a portion of the work load from**
    **the MAC, which is software implemented, by performing many of the tasks typically**

27  **performed by prior art MAC's.**  These tasks may include, during a downlink, sorting data

28

according to priority, storing a data frame of highest priority data, sorting the data frame according to modulation type, forward error correction ("FEC") type, end user connection ID, or other criteria, appending a set of CPE settings to the data frame, and appending physical layer information (used by the modem) to the data frame. During an uplink, according to the present invention, the **MAC coprocessor receives all the data and routes the data** either to the MAC or a network backhaul. In both the downlink and uplink processes**, having a MAC coprocessor working in conjunction with the MAC** may significantly increase the communication system's throughput.

In accordance with the present invention, the present inventive method **transmits downlink data directly from a QoS module to the MAC coprocessor ("MCP") for storage**, sorting, and updating. In other words, the MAC software has a much lighter load because it never sees the actual data.

('687 Patent, Col. 2:59-67, 3:1-21.)

According to the specification, a coprocessor is a secondary processor, coupled to the primary processor, configured to perform a particular subset of the workload of the primary processor by receiving guiding direction from the primary processor. Further, the term "coprocessor" is used throughout the independent Claims of the '687 Patent. (See '687 Patent, Claim 1, Col. 25:45-63; Claim 24, Col. 27:26-40; Claim 38, Col. 28:42-54; Claim 49, Col. 29:43-67.)

In the computer industry, the ordinary and customary meaning of "coprocessor" is a special purpose secondary processing unit that assists the primary processing unit by performing particular functions.[16] Thus, a person of ordinary skill in the art reading the specification and Claim 56, would understand that the inventors used the word "coprocessor" with its ordinary and customary meaning.

The Court finds that the term coprocessor is used throughout the specification and in the Claims as a secondary processor configured for a particular purpose, namely, to perform a subset of the workload of the primary processor. While the particular coprocessor configuration defined by the inventors may differ based on the system within which the coprocessor is embedded, at no point does the specification envision the coprocessor as simply an additional primary processor

---

[16]  See RANDOM HOUSE WEBSTER'S COMPUTER & INTERNET DICTIONARY 122 (3rd ed. 1999) ("A special purpose processing unit that assists the CPU in performing certain types of operations."); INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERING (IEEE) DICTIONARY OF STANDARDS TERMS 240 (7th ed. 2001) ("A processor used in conjunction with a central processing unit, designed to perform specific functions that may not be executed efficiently by the central processing unit . . . .").

United States District Court

For the Northern District of California

performing a general function within the system.  Further, the Court finds that the specification and Claims describe that the coprocessor does not merely apportion or store a subset of the workload for the primary processor but instead actually performs a portion of the workload normally dedicated to the primary processor.

Accordingly, as used in Claim 56 of the '687 Patent, the Court construes the term "coprocessor" to mean:

> **The special purpose processor in the Customer Premises Equipment that allocates an allotted portion of the uplink data frame among a plurality of end user connections that are coupled to the Customer Premises Equipment and in so doing performs a portion of the media access control processing.**

**B.      The '866 Patent**

Claim 12 of the '866 Patent provides:

> A method of re-synchronizing data in a wireless communication system, wherein the wireless communication system includes a plurality of **customer premise equipment ("CPE")** in communication with associated and corresponding **base stations** having uplink and downlink communication links with the plurality of CPEs, and wherein the **base stations** maintain uplink and downlink sub-frame maps representative of bandwidth allocations in the uplink and downlink communication links, and wherein the **base stations** each include an associated and corresponding media access control (MAC) having a plurality of MAC data messages, and wherein the MAC transports a MAC data message through a MAC data packet that is mapped to at least one **TC/PHY packet** in a layered data transport architecture, and wherein each **TC/PHY packet** includes a header present field, and wherein at least one of the communication links may be intermittently disrupted during data transmission, the method comprising the steps of:
>
> (a) detecting a disruption of a communication link during data transmission;
>
> (b) reestablishing the communication link that was detected as disrupted at step (a);
>
> (c) receiving a **TC/PHY packet**;
>
> (d) detecting the header present field of the **TC/PHY packet** received at step (c), and if data in the header present field indicates the presence of a particular kind of data within a payload of said **TC/PHY packet**, proceeding to step (e), else returning to step (c); and
>
> (e) resuming data transmission on the disrupted communication link, wherein at most only one MAC data message is lost after reestablishing the communication link in step (b).

17

**1.      The Preamble's Limitation on Claim Scope**

The Preamble of Claim 12 provides:

> A method of re-synchronizing data in a wireless communication system, wherein the wireless communication system includes a plurality of **customer premise equipment ("CPE")** in communication with associated and corresponding **base stations** having uplink and downlink communication links with the plurality of **CPEs**, and wherein the **base stations** maintain uplink and downlink sub-frame maps representative of bandwidth allocations in the uplink and downlink communication links, and wherein the **base stations** each include an associated and corresponding media access control ("MAC") having a plurality of MAC data messages, and wherein the MAC transports a MAC data message through a MAC data packet that is mapped to at least one **TC/PHY packet** in a layered data transport architecture, and wherein each **TC/PHY packet** includes a header present field, and wherein at least one of the communication links may be intermittently disrupted during data transmission, the method comprising the steps of:

('866 Patent, Col. 20:11-28.)

The phrases "customer premises equipment ("CPE")" and "base station" are only recited in the Preamble. The other disputed phrases are not recited in the Preamble. Thus, as with Claims 56 and 64 of the '687 Patent, the Court finds that the Preamble to Claim 12 is limiting with respect to the phrases "customer premises equipment ("CPE")" and "base station" but not with respect to the other disputed phrases of the '866 Patent.

**2.      "customer premises equipment ("CPE")" and "base station"**

The parties dispute the meaning of the terms "customer premises equipment ("CPE")" and "base station." Neither the language of Claim 12 nor the written description use these terms in a novel way.[17] Accordingly, the Court construes these terms to have the same meanings as found with respect to Claims 56 and 64 of the '687 Patent.

**3.      "TC/PHY"**

The parties dispute the meaning of the acronym "TC/PHY" as it is used in the term "TC/PHY packet." The use of acronyms pervades the patent specification as a form of shorthand

---

[17] (See e.g., '866 Patent, Col. 1:36-41, 45-52, 66-67, 2:1-10 for discussion of "base station"; and Col. 1:63-66 for discussion of "customer premises equipment ("CPE").)

United States District Court

For the Northern District of California

1  when technical terms are introduced.[18]  Similarly, the specification provides definitions for the

2  acronyms "TC," "PHY," and "TC/PHY."

3       The physical layer contains **Transmission Convergence/Physical ("TC/PHY")** packets having fixed length payloads.

4       The present data transportation and synchronization invention relies upon fixed length **transmission convergence/physical TC/PHY** packets to transport variable length

5  MAC packets that are relatively de-coupled from the **physical (PHY)** layer.  The **transmission convergence (TC)** layer provides a de-coupling means between the MAC

6  layers and the PHY layer.

7  ('866 Patent, Col. 4:3-5, 9:54-60.)

8       The Court finds that the use of acronyms in the patent specification does not import any

9  special meaning but instead acts solely as a form of shorthand for technical terms that are used

10  repeatedly.  Thus, the Court imports no meaning to the acronym "TC/PHY" beyond its plain

11  meaning, which is a shorthand expression for the phrase "transmission convergence/physical."

12       **4.  "TC/PHY packet"**

13       The parties dispute the meaning of the term "TC/PHY packet."

14       The invention described in the '866 Patent relates to the transport of data between a media

15  access control ("MAC") layer and a physical ("PHY") layer.  The problems associated with prior art

16  transportation protocols are detailed in the Background section of the specification as follows:

17       One objective of a communication protocol is to efficiently transport data between the MAC and physical layers.  A communication protocol must balance the need for

18  transmitting data at maximum bandwidth at any given time against the need for maintaining synchronization between the MAC and physical layers when the data is lost during

19  transportation. . .

       **One prior art communication protocol teaches a system for transporting MAC**

20  **messages to the physical layer using variable length data packets comprising headers and payloads**. . . .  [T]his type of protocol provides poor synchronization between the MAC

21  and physical layers because when the system loses a header the protocol overlooks all of the subsequent data until it finds the next header at the beginning of the physical layer boundary.

22  . . . **It is therefore an inefficient communication protocol for use in a wireless communication system**.

23       Another prior art protocol teaches **a system for transporting MAC messages using fixed length data packets**. . . .  [T]he fixed length data packet protocol provides adequate

24  MAC to physical layer synchronization.  However, the fixed length data packet protocol

25

26  [18]   (See e.g., '866 Patent, Col. 2:35-36 (media access control ("MAC")); 2:41 (quality of service ("QoS")); 6:62 (physical slots (PS)); 9:9-12 (Time Division Multiplexing (TDM), Higher

27  Layer Control Message (HLCM), Continuing Grant (CG), and Demand Assigned Multiple Access (DAMA)).)

28

1    provides poor bandwidth usage . . . .  **[T]he fixed length packet protocol typically wastes a large amount of bandwidth on a regular basis**.

2    ('866 Patent, Col. 2:54-61, 2:63-67, 3:6-12, 15-19, 24-27, 30.)

3

4    The '866 Patent teaches a novel method for efficiently transporting and synchronizing data between the MAC and physical layers in a wireless communication system.

5

6    The present data transportation and synchronization invention **relies upon fixed length transmission convergence/physical TC/PHY packets to transport variable length MAC packets** that are relatively de-coupled from the physical (PHY) layer.  The transmission convergence (TC) layer provides a de-coupling means between the MAC layers and the PHY layer. . . .

7

8    The TC/PHY packet format 700 (TDU) provides **a mechanism for mapping of MAC entities (packets) to PHY elements**. . . .

9    FIG. 8 shows a preferred embodiment of a four-stage mapping from a stream of variable length MAC messages **to a 228-bit TC Data Unit (TDU), otherwise known as a TC/PHY packet**. . . .

10   In the preferred embodiment of the present invention, a TC/PHY packet has a **payload (FIG. 7) with a maximum capacity of 208 bits**.  The preferred maximum of 208 bits is exemplary only and one of ordinary skill in the art will recognize that **other TC/PHY packet formats can be used and can have different maximum payloads**.

11

12

13   ('866 Patent, Col. 9:54-58, 13:52-54, 14:7-10, 16:18-24.)

14   The Court finds that the TC/PHY packets are described throughout the specification as

15   having a fixed length payload.  While the size of the TC/PHY packet formats may differ, at no point

16   does the specification envision TC/PHY packets with variable length payloads.  In fact, the Court

17   finds that the inventors used fixed length payload TC/PHY packets in order to overcome the

18   problems associated with the prior art as described in the Background section of the specification.

19   Accordingly, as used in Claim 12 of the '866 Patent, the Court construes the phrase

20   "TC/PHY packet" to mean:

21   **A fixed length packet in a wireless communication system, for transporting data between the media access control layers and the physical layer.**

22

## V.  CONCLUSION

23   In this Order, the Court has given its construction of submitted words and phrases of the '687

24   and the '866 Patents.

25   The parties shall appear for a Case Management Conference on **February 7, 2011 at 10 a.m.**

26   On or before **January 28, 2011**, the parties shall submit a Joint Case Management Statement.  The

27

28                                          20

**United States District Court**
For the Northern District of California

Statement shall include, among other things, a good faith discovery plan with a proposed date for the
close of all merits discovery and a stipulation as to a mediation process.

Dated:  January 7, 2011

_____
JAMES WARE
United States District Chief Judge

1    **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2    Adam R. Alper aalper@kirkland.com
     Amy Rebecca Schofield aschofield@kirkland.com
3    Christian Chadd Taylor christian.taylor@kirkland.com
     Gayle Rosenstein Klein gklein@mckoolsmith.com
4    Gianni Cutri gcutri@kirkland.com
     Gregory S. Arovas garovas@kirkland.com
5    John Richard Edwards john.edwards@kirkland.com
     Laura Ann Handley lhandley@mckoolsmith.com
6    Michael G. McManus mmcmanus@mckoolsmith.com
     Robert A. Cote rcote@mckoolsmith.com
7    Thomas H R Denver tdenver@mediationmasters.com

8
     **Dated:  January 7, 2011**                              **Richard W. Wieking, Clerk**
9

10                                                            **By:      /s/ JW Chambers**
11                                                               **Elizabeth Garcia**
                                                                 **Courtroom Deputy**
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California